Filed 6/22/21  P. v. Steele CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>CLEO STEELE, et al.,<br><br>　　　Defendants and Appellants. | B302850,<br>consolidated with B304294<br><br>(Los Angeles County<br>Super. Ct. No. NA102745)<br><br>ORDER MODIFYING<br>OPINION AND DENYING<br>REHEARING; NO CHANGE<br>IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed on May 24, 2021, be modified as follows:

1. On page 27, the second to last sentence beginning with "The trial court" and ending with "against Johnson" is modified to read as follows:

> The trial court admonished the jury that this testimony regarding Steele was not admissible against Johnson, stating, "for the record, this testimony only goes to Mr. Steele."

2. On page 27, footnote 10, the last sentence beginning with "Johnson" and ending with "error" is deleted.

3. The paragraph commencing at the bottom of page 33 with "In addition" and ending at the top of page 34 with "predicate act].)" is deleted.

There is no change in the judgment. Appellant Deven Johnson's petition for rehearing is denied.

_____

ROTHSCHILD, P. J.            CHANEY, J.            FEDERMAN, J.*

---

      * Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B302850, consolidated with B304294 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. NA102745) |
| CLEO STEELE, et al., | |
| Defendants and Appellants. | |

APPEALS from a judgment of the Superior Court of Los Angeles County, Richard M. Goul, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Randall Conner, under appointment by the Court of Appeal, for Defendant and Appellant Cleo Steele.

Aurora Elizabeth Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant Deven Jamar Johnson.

Xavier Becerra and Rob Bonta, Attorneys General, Matthew Rodriguez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior

Assistant Attorney General, Scott A. Taryle and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted codefendants and appellants Cleo Steele and Deven Jamar Johnson of home invasion robbery and first degree burglary. The jury further found true allegations that the offenses were gang-related and that a principal used a firearm during the commission of the offenses. The trial court separately found true prior strike and prior serious felony enhancements as to Steele and sentenced him to an aggregate term of 45 years to life in state prison. The court sentenced Johnson to a total term of 19 years in state prison.

Steele and Johnson appeal their convictions on several grounds. Johnson asserts: (1) the trial court violated his state and federal constitutional rights by allowing the prosecution's gang expert to repeatedly testify to inadmissible hearsay, and (2) a remand is necessary to allow the trial court to "strike" rather than "stay" sentencing on the gang enhancement. Steele asserts: (1) the record contains insufficient evidence from which to conclude that he was the gunman who personally used the firearm during the robbery, thereby precluding the trial court from imposing sentences for both the firearm and gang enhancements pursuant to Penal Code section 12022.53, subdivision (e)(2),[1] and (2) there was insufficient evidence to support the jury's finding that the offense was committed to benefit a criminal street gang. Both appellants also contend that they are entitled to two additional days of presentence custody credit, an issue respondent concedes on appeal.

_____

[1] All further statutory references are to the Penal Code unless otherwise specified.

We conclude that (1) the vast majority of the gang expert's testimony was permissible under prevailing law and that any testimony erroneously admitted was harmless beyond a reasonable doubt, and (2) there was sufficient evidence to support the gang enhancement challenged by Steele. We also conclude, however, that the trial court committed several sentencing errors with regard to each appellant.

As to Johnson, the trial court erred by imposing and then staying the gang enhancement, when, under applicable statutes, it must strike the enhancement with the shortest penalty term. As to Steele, the trial court lacked the authority to impose sentence on both the firearm and gang enhancements in the absence of any jury finding that Steele personally used a firearm. As to both appellants, the trial court erred in failing to select and pronounce a term for count 2 (and any associated enhancement allegations) prior to staying sentence under section 654. Lastly, we direct the trial court to grant both appellants two additional days of presentence custody credits.

Accordingly, we affirm the judgments of conviction but remand for further sentencing proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

**A.     Prosecution Evidence**

1.     *Home Invasion Burglary and Robbery*

At about 7:47 p.m. on September 30, 2015, John C. was in the garage of his house in Signal Hill, repairing a light fixture.[2] The garage door was open. John heard someone running in his

---

[2] To protect the privacy of the victims, we will refer to them by their first names and last initial. (Cal. Rules of Court, rule 8.90.)

driveway, and looked up to see a man pointing a black semiautomatic handgun at him.  The handgun had a blue clip that extended from the handle.  Another man appeared wearing a hoodie that obscured his features.  Both men were African-American.  John briefly noticed the "determined" and "angry" eyes of the person holding the gun, but his attention was focused on the gun.  The gunman told John to drop the items he was holding, which included a flashlight.  John complied.

The gunman ordered John to turn around, placed the handgun against the back of his head, and directed him into the house through the entry door in the garage.  As they stepped through the doorway, John saw his wife, Laura C., and told her they were being robbed.  The gunman ordered John and Laura to lie face down on the ground in the dining room, frisked them, and then took their wedding rings and John's watch.  The gunman repeatedly asked, "Where's your cash?" and "Where's your gold?"  John responded that he had left his wallet in the bedroom downstairs.  The second man went downstairs.  Laura indicated her purse was on the table, and the intruders took $50 from her purse.  The burglars also took a dress watch that was on the dining table.

The gunman became agitated because the victims did not reveal any stores of cash or gold.  The gunman stood on John's back and put the handgun to the back of his head.  John told the gunman he kept a safe in the downstairs bedroom closet with papers and two guns.  The gunman instructed the second man to check the closet.

The home alarm system announced when a door or window was opened, so John could tell that the second man was going through the rooms upstairs and downstairs.  John also heard the garage door open several times and someone running down the

4

stairs.  Based on the footsteps and alarm system alerts that he heard, John believed a third person might have entered the house.

The gunman repeatedly threatened to kill the couple.  John told him that Laura's wedding ring was worth $12,000, and they did not have anything else of significant value.  The gunman became less agitated.

At one point, John heard the garage door and thought the men had exited the house.  He jumped to his feet, but the gunman threw him to the ground and demanded duct tape.  John said he did not have any duct tape, and the men left soon thereafter.

While Laura called 911, John ran to a stained-glass window near the front door.  He saw two people struggling to carry a heavy object up the street.  John quietly exited the house and, while hiding behind a bush, saw the men get into a "big boat American car" like a Buick, Pontiac, or Oldsmobile.  The car passed John's position as it proceeded toward Cherry Avenue.  The car, a large dark-colored sedan, had a broken headlight.

After the robbery, Laura noticed the men had taken two of John's watches that had been on a counter next to her purse.  They also took a bracelet, a pair of earrings, and other jewelry kept in a box on her bedroom dresser.

2.    *Police Investigation*

a.    <u>Suspect Vehicle Stop</u>

At 8:02 p.m. Signal Hill Police Department (SHPD) Officer Andrew Serna received a dispatch call about a home invasion robbery and a description of the getaway car.  About a minute later, while driving south on Cherry Avenue, Officer Serna saw a vehicle with a broken headlight matching the description of the suspect's car traveling away from the location of the victims' home.  Officer Serna followed the car into the parking lot of a Home Depot store on

5

Cherry Avenue. He stopped the car and detained the occupants, waiting for additional officers.

The adult occupants of the vehicle were identified as Charro Tovar (the driver), Steele (the front passenger), and Johnson (the rear passenger seated behind Tovar). T.T., Tovar's six-year-old daughter, occupied the rear passenger-side seat.

There was a flashlight in the car and a safe in the trunk. No weapons were found. Officer Serna found a bracelet and a pair of earrings in the front pocket of Johnson's shorts. After speaking with T.T., police searched the car for a firearm, but found none.

SHPD Officer Raul Ramirez, walking along Tovar's route backwards from the Home Depot parking lot, found a black LG cell phone in the Home Depot parking lot, belonging to Steele, and an off-white hooded sweatshirt on Cherry Avenue near the entrance to the parking lot. The sweatshirt pocket contained a tangled ball of jewelry and two watches.

b.      Field Show Up

The police took John and Laura separately to the Home Depot parking lot on Cherry Avenue about 30 minutes after the robbery.

Two suspects were shown to John. John "could not be sure" that Steele was one of the robbers, but recognized Johnson immediately as the robber wearing the hoodie. John was able to identify Johnson, in part, by his distinctive high socks, shorts, and sneakers. John identified the robbers' car, as well as his custom flashlight found inside the car, his safe, and the safe's contents.

Laura could not positively identify either of the two suspects, but thought Johnson could have been the younger "second" robber, who was receiving orders from the gunman. She believed this based on his "frame, his weight, his general look, clothing," and his "low shoes" paired with "high socks" that resembled those worn by the second robber. She identified the jewelry found in Johnson's

6

shorts as hers, as well as the tangled ball of jewelry and two watches found in the hooded sweatshirt.

John's wedding ring was found on the street outside his home, but his watches were never recovered. Laura's wedding ring was never recovered.

### 3. *Cell Phone Data*

A search warrant for GPS location data was used to gather information from Steele's cell phone. On September 30, 2015, at 7:55 p.m., Steele's cell phone was within seven meters of the victims' residence in Signal Hill. Steele's cell phone also was near the victims' residence on September 23, 24, and 25, 2015.

### 4. *T.T.'s Statements to Police*

SHPD Sergeant Alex Gabaldon spoke with T.T. in the Home Depot parking lot. T.T. told Gabaldon that her "father" (referencing Steele) had left the car with a large blue gun, and that he had returned to the car with "Funky Hair" (referencing Johnson.) She saw Johnson throw a sweater with jewelry in it out of the window of the car. She reported that the gun was under the front passenger seat.

### 5. *T.T.'s Trial Testimony*

T.T. testified that while she was at a park with her mother and Steele, Steele met with "Crazy Hair" (referencing Johnson), and others.[3] T.T.'s mother then drove her and Steele (but not Johnson) to a place on a big hill with lights. Neither T.T.'s mother nor Steele left the car. Steele, however, obtained someone's flashlight and put

---

[3] T.T. testified that one of the people Steele met at the park was "Bingo." Johnnie Johnson, aka "Bingo," was initially charged as a codefendant in the second amended information. (See fn. 5, *post*.)

it on the floor of the car. They left the area about 35 to 45 minutes later, this time with Johnson, and accompanied by at least one other car.

Before the police stopped them, T.T. saw Steele's gun in the backseat next to her. She put it under a seat.

6. *Gang Expert's Testimony*

Los Angeles County Sheriff's Detective Ernesto Castaneda testified as an expert on criminal street gangs. Two months prior to the robbery, Steele admitted to Detective Castaneda that he was a member of a group called the Underground Crips (UGC), which is one of several groups operating under an umbrella association known as the Rollin' 100's. Detective Castaneda observed UGC tattoos on Steele's neck and back during this contact. Photographs taken shortly before the trial also depicted Steele with several UGC related tattoos on his head, chest, and arms.

Detective Castaneda explained that the Rollin' 100's rivals are the Hoovers. The term "HK" stands for "Hoover Killer." Just weeks before the instant offense, Johnson made references to HK and the "Hundreds" on his Facebook page, including a statement that he "[s]tarted school at HK University." Posted photographs showed Johnson wearing clothing associated with the UGC gang. In addition, Johnson's Facebook profile used the name "Infant Bill." Monikers using the name "Bill" were popular and were inspired by respected UGC member Billy Shepard, whose moniker was "Lil Hundred Dollar Bill."

Photographs taken before trial revealed several UGC related tattoos on Johnson's face, neck, and hand. In particular, Johnson had a dollar sign tattooed underneath his eye, and a moneybag with a dollar sign on his hand, signifying he was a member of a burglary/robbery crew. Gang tattoos are generally earned for "putting in [the] work" (i.e., committing crimes for the benefit of the

8

gang).[4]  Moreover, if an individual obtained gang tattoos without being a gang member, there would be violent repercussions against him.

Based on a hypothetical situation, mirroring the prosecution's case, Detective Castaneda opined that the home invasion robbery was committed for the benefit of, or in association with, a criminal street gang.

## B.  Defense Evidence

In response to Detective Castaneda's testimony that over 90 percent of UGC members are unemployed, Johnson's mother testified that Johnson was employed at a coffee house as a cook and busser around the time of the robbery.

Johnson and Steele introduced their own gang experts to contradict Detective Castaneda's conclusions.

Johnson's expert, Kimi Lent, was a gang intervention specialist.  She was familiar with the UGC.  Lent testified that African American gangs like UGC are "loosely structured" and their members do not have an obligation to share the proceeds of their crimes or to earn their tattoos.  Presented with hypotheticals that tracked the evidence, and assuming the two suspects were members of the same gang, Lent was not able to state with any confidence that the hypothetical robbery was committed "at the direction of, in association with, or for the benefit of" the gang.  She explained that

---

[4] Detective Castaneda conceded he did not know which tattoos, if any, Johnson had at the time of the offense (which occurred four years prior to trial).  Nonetheless, he explained that even if Johnson did not have any of the tattoos at the time of the robbery—and only obtained them after his arrest—the tattoos were significant because Johnson chose to get UGC tattoos on his face, neck, and hand while facing felony charges that included a gang enhancement.

9

even "gang members can commit crimes that are personal in nature," and they can do so together. In order to conclude that "this was definitely a gang crime," Lent would have to know whether people in the UGC neighborhood were aware of the crime or whether there were social posts to that effect.

Steele's gang expert, Dr. James Vigil, also contradicted the notion that tattoos needed to be earned, stating that gang members get tattoos on their own initiative. Dr. Vigil further testified that African American gangs such as UGC do not share proceeds. Offered a similar hypothetical, Dr. Vigil opined there was insufficient evidence from which to conclude the incident in the hypothetical was committed with an intent to benefit a gang.

## C.    Charges and Jury Verdicts

In a second amended information, the People charged Steele and Johnson with home invasion robbery (§§ 211, 213; count 1), and first degree burglary (§ 459; count 2). The information also charged Steele with child abuse or neglect (§ 273a, subd. (a); count 3).[5] As to counts 1 and 2, the information alleged that the crime was committed for the benefit of, at the direction of, or in association with, a criminal street gang (§ 186.22, subd. (b)(4)), and that a principal personally used a firearm (§§ 12022, subd. (a)(1), 12022.53, subds. (b) & (e)(1)). As to Steele, the information alleged he had a prior strike conviction under the Three Strikes law (§§ 667, subd. (d), 1170.12, subd. (b)), a prior serious felony

---

[5] The second amended information charged Charro Tovar, the driver of the car, and mother of T.T., in counts 1, 2, and 3, and also charged codefendant, Johnnie Johnson (aka "Bingo") in counts 1 and 2. The charges against Tovar and Johnson were not addressed in the trial involving Steele and Johnson.

conviction (§ 667, subd. (a)(1)), and had served a prior prison term (§ 667.5, subd. (b)).

Steele and Johnson were tried jointly. The jury convicted both as charged in counts 1 and 2, and found true the gang and firearm allegations. The jury found Steele not guilty of the child abuse charge in count 3. The trial court subsequently found true the prior prison term, prior strike, and prior serious felony conviction enhancements as to Steele.

On November 20, 2019, the trial court sentenced Steele to 45 years to life in state prison, consisting of 15 years to life on count 1, doubled due to the strike prior, plus a consecutive sentence of 10 years for the firearm enhancement and five years for the prior serious felony conviction. The court stayed the sentence on count 2 pursuant to section 654.[6]

On the same day, the trial court sentenced Johnson to serve 19 years in state prison. The court selected the upper term of nine years on count 1, and added 10 years for the firearm enhancement. The court indicated it was "choosing to stay . . . the gang allegation, given its imposition of the gun allegation." The court further stayed the sentence on count 2, pursuant to section 654.

Steele and Johnson timely appealed their respective judgments, and we consolidated their appeals.

---

[6] The trial court did not impose a term for the prior prison term enhancement, and it does not appear in Steele's abstract of judgment. (See Discussion VI, *post*.)

# DISCUSSION

## I

## Johnson's Assertion of *Sanchez*/*Crawford* Error

Johnson contends the trial court committed reversible error by allowing the prosecution's gang expert to testify about inadmissible case-specific, and sometimes testimonial, hearsay in violation of *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*) and *Crawford v. Washington* (2004) 541 U.S. 36 [124 S.Ct. 1354, 158 L.Ed.2d 177] (*Crawford*). Respondent counters there was no error, and in the alternative, any error was harmless under the more lenient *Watson* standard. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) We conclude the vast majority of the gang expert testimony was not testimonial, and was properly admitted as general background information, independently corroborated by the personal observations and knowledge of the expert, or subject to a valid hearsay exception. Any testimony erroneously admitted was harmless under even the more stringent *Chapman* standard of review. (See *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705] (*Chapman*).)

## A.  Relevant Legal Principles

### 1.  *Standard of Review*

We review the trial court's evidentiary rulings, including those that turn on the hearsay nature of the evidence, for abuse of discretion (*People v. Harrison* (2005) 35 Cal.4th 208, 230; *People v. Waidla* (2000) 22 Cal.4th 690, 725), keeping in mind that an abuse of discretion occurs when the trial court makes an error of law. (*People v. Patterson* (2017) 2 Cal.5th 885, 894; *People v. Morrison* (2004) 34 Cal.4th 698, 724; see *People v. Rowland* (1992) 4 Cal.4th 238, 266 [a trial court's ruling regarding the admissibility of evidence underlying an expert's opinion is subject to an abuse of

discretion standard, but its conclusion regarding an underlying legal principle is subject to independent review].)

If error is found, any violation of state evidentiary rules is reviewed for prejudice under the *Watson* standard. (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103; *Sanchez, supra*, 63 Cal.4th at pp. 685 & 698; *People v. Watson, supra*, 46 Cal.2d at p. 836.) A violation of the confrontation clause is reviewed for harmless error under the *Chapman* standard. (*People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 912; *Sanchez, supra,* at p. 698; see *Chapman, supra*, 386 U.S. at p. 24 ["before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"].)

2.     *Experts, Hearsay, and the* Sanchez *Rule*

Hearsay generally is inadmissible, unless it falls under an exception. (Evid. Code, § 1200, subds. (a), (b); *Sanchez, supra*, 63 Cal.4th at p. 676.) Although expert witnesses frequently acquire knowledge in their field of expertise from hearsay sources, "[t]he hearsay rule has traditionally not barred an expert's testimony regarding his general knowledge in his field of expertise." (*Sanchez, supra*, at p. 676.)

In *Sanchez*, our Supreme Court explained that "[w]hen any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay." (*Sanchez, supra*, 63 Cal.4th at p. 686.) The high court defined "[c]ase-specific facts" as "those relating to the particular events and participants alleged to have been involved in the case being tried." (*Id.* at p. 676.) It held that an expert's recitation of case-specific facts is prohibited if the facts are outside the expert's personal knowledge, do not fall under an exception to the hearsay rule, or have not been independently established by competent evidence.

(*Id*. at pp. 676-677, 686.) *Sanchez* preserved an expert's ability to rely on and cite background information "regarding his knowledge and expertise and premises generally accepted in his field" and to "tell the jury *in general terms*" "the kind and source of the 'matter' upon which his opinion rests." (*Id*. at pp. 685-686.) To elucidate the distinction between general background information and case-specific facts, *Sanchez* provided the following example in a gang-related context. "That an associate of the defendant had a diamond tattooed on his arm would be a case-specific fact that could be established by a witness who saw the tattoo, or by an authenticated photograph. That the diamond is a symbol adopted by a given street gang would be background information about which a gang expert could testify. The expert could also be allowed to give an opinion that the presence of a diamond tattoo shows the person belongs to the gang." (*Sanchez*, *supra*, 63 Cal.4th at p. 677.)

3.    *The Confrontation Clause and the* Crawford *Rule*

In *Crawford*, the United States Supreme Court held that the admission of "testimonial" hearsay against a criminal defendant violates the Sixth Amendment right to confront and cross-examine witnesses. (*Crawford*, *supra*, 541 U.S. at pp. 53-54.) In light of *Crawford*, the *Sanchez* court held that an additional step of analysis is required in criminal cases to determine if an expert's statements qualify as "*testimonial* hearsay." (*Sanchez*, *supra*, 63 Cal.4th at p. 686). Canvassing confrontation clause cases, the *Sanchez* court concluded hearsay statements are testimonial if they are made "primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony. Nontestimonial statements are those whose primary purpose is to deal with an ongoing emergency or some other purpose unrelated to preserving facts for later use at trial." (*Id*. at p. 689, fn. omitted, citing *Michigan v. Bryant* (2011) 562 U.S. 344 [131. S.Ct. 1143, 179

14

L.Ed.2d 93] and *Davis v. Washington* (2006) 547 U.S. 813 [126 S.Ct. 2266, 165 L.Ed.2d 224].)

## B. Analysis of Testimony Challenged by Johnson

### 1. *The Gang Expert Explained His Background and Training in General Terms*

In *Sanchez*, the high court took care to note the defendant was not challenging the expert's "background testimony about general gang behavior or descriptions of the . . . gang's conduct and its territory," which was "based on well-recognized sources in [the expert's] area of expertise." (*Sanchez*, s*upra*, 63 Cal.4th at p. 698.) The high court observed such testimony "was relevant and admissible evidence as to the . . . gang's history and general operations." (*Ibid.*)

Like the expert in *Sanchez*, Detective Castaneda explained his knowledge and training in general terms. He testified his expertise was built on the conversations he had had with detainees while working at the local jail and as a patrol officer handling a large volume of gang-related cases, including crimes committed by UGC members. His knowledge of the UGC gang was based on information conveyed by its members directly to him and to other officers, as well as booking photographs displaying tattoos he knew to be associated with the group.

According to Detective Castaneda, UGC is a gang with approximately 75 to 100 members. From 2008 to 2013, he personally arrested 60 to 70 UGC gang members. From 2013 to 2017, he was promoted to detective gang investigator and assigned to the South Los Angeles Sheriff's Station. His duties included investigating gang-related crimes, focusing on the Rollin' 100's group of criminal street gangs, which included UGC, and their rival gangs. He investigated armed robberies, burglaries, and shootings, among other crimes. From 2013 to 2016, he conducted over 100

15

investigations involving UGC gang members.  On a weekly basis, he would contact gang members and speak with community members about the gang.

In so testifying, Detective Castaneda laid a general foundation for his testimony.  (See, generally, *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1330 [an expert's "eight years dealing with the gang, including investigations and personal conversations with members, and reviews of reports suffices to establish the foundation for his testimony" regarding the gang's primary activities]; *In re Alexander L.* (2007) 149 Cal.App.4th 605, 613 [an expert lays a proper foundation by establishing that his or her opinion is based on "conversations with the defendants and with other [gang] members, . . . personal investigations of hundreds of crimes committed by gang members, as well as information from . . . colleagues and various law enforcement agencies"].)  In large part, his testimony avoided referring "to any particular statement made by any one person to him," and was not hearsay and thus did not violate either *Sanchez* or the confrontation clause.  (*People v. Vega-Robles* (2017) 9 Cal.App.5th 382, 413.)

> 2. *In Determining Whether the Specific Testimony Challenged by Johnson is Case-specific, Our Focus is on the Nature of the Information Disclosed, Not Its Source*

Johnson notes that foundational objections raised by trial counsel during Detective Castaneda's testimony, and a line of questioning pursued during cross-examination by defense counsel, prompted the detective to provide more specific examples of his source material.  Based on the specificity of the detective's answers, Johnson argues the testimony constituted case-specific hearsay.

In a post-*Sanchez* case, our high court clarified the approach to evaluating whether testimony is case-specific.  "The focus of the inquiry is on the information conveyed by the expert's testimony,

16

not how the expert came to learn of such information.  Thus, regardless of whether an expert testified to certain facts based on composite knowledge 'acquired from sources too numerous to distinguish and quantify' or if the expert simply looked up the facts in a specific reference as part of his or her duties in a particular case, the facts remain the same.  The background or case-specific character of the information does not change because of the source from which an expert acquired his or her knowledge."  (*People v. Veamatahau* (2020) 9 Cal.5th 16, 30 (*Veamatahau*).)

Accordingly, in assessing whether the specific lines of expert testimony challenged by Johnson constitute "background information" or "case-specific facts," we maintain our focus on the nature of the information conveyed to the jury, as opposed to the source of the information.

3.    *Detective Castaneda's Testimony Regarding the UGC's Culture, Rules, and Expectations Constituted General Background Information, Not Case-specific Facts*

Johnson complains that Detective Castaneda improperly testified about: (1) the expectation that crime proceeds would be distributed among gang members; (2) the likelihood of retribution for failing to distribute such proceeds; (3) the likelihood any retaliation would be violent; (4) the likelihood UGC would engage in such retaliatory conduct; (5) the requirement that tattoos be "earned"; (6) the likelihood an individual would engage in bragging while in custody; (7) the benefits a gang receives from bragging; and (8) that UGC members typically are unemployed.

"Since *Sanchez,* California appellate courts have held that expert testimony about 'the general attributes of the . . . gang, such as the gang's culture, the importance placed on reputation and guns, . . . the gang's rivals and claimed turf, the use of monikers and identifying symbols, and the like, [are] permissible as expert

17

background testimony.' [Citations.]" (*People v. Anthony* (2019) 32 Cal.App.5th 1102, 1138; see also *People v. Meraz* (2018) 30 Cal.App.5th 768, 780.) Consistent with these cases, the information conveyed by Detective Castaneda in each of the categories identified by Johnson concerns the general behavior and habits of the UGC gang. It qualifies as the type of background information that is permissible under *Sanchez*, and may form the basis of the expert's opinion, even if it is derived from hearsay. (*Sanchez*, *supra*, 63 Cal.4th at pp. 685-686, 698.) Moreover, as the testimony concerned the general behaviors of the UGC gang, without divulging any out-of-court statements, it did not amount to testimonial hearsay in violation of *Crawford*. (*People v. Thompkins* (2020) 50 Cal.App.5th 365, 404 (*Thompkins*).)

Johnson suggests that by overruling some of his "foundational" objections to the above lines of testimony, the trial court "hindered [his] ability to prevent the prosecution's introduction of inadmissible evidence." However, as explained in *Veamatahau*, if testimony is properly characterized as "background information" it so remains regardless of the underlying source. (*Veamatahau*, *supra*, 9 Cal.5th at p. 26.) Under *Sanchez*, "[a]ny expert may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so." (*Sanchez*, *supra*, 63 Cal.4th at p. 685.) This is what Detective Castaneda did in this case.[7]

_____

[7] The *Sanchez* court expressly recognized that allowing an expert who relies on hearsay to simply "tell the jury *in general terms* that he did so . . . may do less to bolster the weight of the opinion" but pointed out that to the extent that "*Crawford* and its progeny . . . complicate some heretofore accepted evidentiary rules, they do so under the compulsion of a constitutional mandate as

4. *Detective Castaneda's Testimony Regarding the Predicate Acts of Two Gang Members*

a. Definition of "Criminal Street Gang" Within the Meaning of Section 186.22

The jury found that both Steele and Johnson committed felonies "for the benefit of, at the direction of, or in association with any criminal street gang," pursuant to section 186.22, subdivision (b). The definition of "criminal street gang" is supplied by section 186.22, subdivision (f).

" 'To establish that a group is a criminal street gang within the meaning of the statute, the People must prove: (1) the group is an ongoing association of three or more persons sharing a common name, identifying sign, or symbol; (2) one of the group's primary activities is the commission of one or more statutorily enumerated criminal offenses; and (3) the group's members must engage in, or have engaged in, a pattern of criminal gang activity. [Citations.]' [Citation.]" (*People v. Lara* (2017) 9 Cal.App.5th 296, 326-327.)

"The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.) Courts have held that expert testimony about a gang's "primary activities" is considered admissible background information under *Sanchez*. (*Thompkins*, *supra*, 50 Cal.App.5th at p. 409; *People v. Vega-Robles*, *supra*, 9 Cal.App.5th at p. 411.)

A "pattern of criminal gang activity" means the commission of " 'two or more' " of the statutorily enumerated offenses. (*People v. Tran* (2011) 51 Cal.4th 1040, 1044; see § 186.22, subd. (e)(1)-(33).)

---

established by binding Supreme Court precedent." (*Sanchez*, *supra*, 63 Cal.4th at p. 686.)

These offenses generally have been termed "predicate offenses" (although the phrase does not appear in the statute), two or more of which must have been committed by gang members within a statutorily-defined timeframe to establish the gang as a "criminal street gang." (§ 186.22, subd. (e).) The predicate offenses need not themselves be " 'gang related,' " i.e., it is not necessary to prove they were committed for the benefit of, at the direction of, or in association with a gang. (*People v. Gardeley* (1996) 14 Cal.4th 605, 610, 621, disapproved on other grounds in *Sanchez, supra,* 63 Cal.4th at p. 686, fn. 13.) Proof of an actual conviction is unnecessary. (*People v. Garcia* (2014) 224 Cal.App.4th 519, 524.) The charged offense at trial may serve as a predicate offense to qualify the gang as a criminal street gang. (*People v. Tran, supra,* at p. 1046; *People v. Gardeley, supra,* at p. 625.)

To prove that a particular gang meets the requirements of section 186.22, subdivision (f), the prosecution usually presents a gang expert to describe the name or " 'identifying sign[s] or symbol[s]' " of the promoted gang; the gang's " 'primary activities' "; and at least two offenses committed by the defendant or his fellow gang members to show the gang had engaged in a " 'pattern of criminal gang activity.' " (*People v. Prunty* (2015) 62 Cal.4th 59, 75-85.) That was the approach the prosecution took in this case, through Detective Castaneda.

Thus, Detective Castaneda testified that UGC had 75 to 100 active members, at least three of whom have admitted their gang membership to him; that their common sign or symbol is primarily "UG" or "UGC"; and that they commonly wear apparel by the Indianapolis Colts football team, which includes the color blue with a horseshoe in the form of a "U." He also demonstrated the UGC common hand sign for the jury. The detective further testified that the primary activities of the UGC gang include robberies,

burglaries, felony vandalism, assaults committed with and without firearms, and attempted murders.

On appeal, Johnson acknowledges that an expert's testimony about the general functioning of gangs has, post-*Sanchez*, been recognized as the kind of background information to which an officer may testify, citing *Thompkins*, *supra*, 50 Cal.App.5th at pp. 403-404. Johnson, however, challenges Detective Castaneda's testimony regarding the two predicate offenses used to establish the gang's pattern of criminal activity. He argues the testimony consisted of case-specific facts and testimonial hearsay, in violation of the confrontation clause. For the reasons explained below, we discern no reversable error.

b.     Testimony Regarding Predicate Offenses

(i)     *Predicate offense involving Marcus Toomes*

At trial, the prosecution introduced a "certified docket" for case No. YA086534. In that case, Marcus Toomes was convicted of committing a robbery on November 1, 2012. The charges did not involve gang allegations. During the investigation of the robbery, Detective Castaneda served a search warrant at Toomes's residence. Detective Castaneda also had three to four contacts with Toomes while working at the Lennox Station patrol.

When the prosecutor asked Detective Castaneda if Toomes was a UGC gang member, Johnson asserted an objection for lack of foundation. The trial court sustained the objection. Detective Castaneda then testified that during three or four prior patrol contacts with Toomes, Toomes admitted his gang membership and gang moniker. Detective Castaneda also observed that Toomes had "100's" tattooed on his chest, which is a tattoo commonly used by UGC members. Detective Castaneda also investigated another crime committed by Toomes, with UGC gang member Erik Ward. Johnson objected on hearsay grounds to the admission by Toomes,

21

and objected on foundation grounds to the testimony that Ward was a UGC member.  The objections were overruled.  Detective Castaneda opined that Toomes was a UGC gang member on September 30, 2015, the date of the home invasion robbery alleged against Steele and Johnson.

(ii)  *Predicate offense involving Eugene Flowers*

The prosecution introduced a certified docket in case No. YA093134.  In that case, Eugene Flowers was convicted of prohibited possession of a firearm on August 6, 2015, in violation of section 29800, subdivision (a)(1).  Detective Castaneda responded to the scene of the incident.  This second predicate offense did not involve a gang allegation.  Detective Castaneda had over 20 prior contacts with Flowers.  Flowers admitted he was a UGC member, displayed his "UG" tattoos, and told Castaneda his gang moniker.  Citing *Sanchez*, Johnson objected that Flowers's statements were hearsay.  The objection was overruled.  Detective Castaneda opined that Flowers was a UGC gang member on September 30, 2015.  Johnson's objection on foundation grounds was overruled.

c.  <u>A Split of Authority Has Developed Regarding Testimony of Predicate Offenses Involving Gang Members Other Than the Defendants on Trial</u>

In proving a gang enhancement allegation under section 186.22, a split of authority has developed regarding the admission of evidence of the predicate offenses committed by gang members.

In *People v. Ochoa* (2017) 7 Cal.App.5th 575 (*Ochoa*), the expert testified that nondefendants involved in the predicate offenses had admitted their gang membership.  (*Id.* at pp. 582, 588-589.)  The First District Court of Appeal found that it "seem[ed] clear" the expert's testimony regarding the admissions of gang membership was case-specific, but any error in its admission was harmless.  (*Id.* at pp. 588-589; see also *People v. Vega-Robles*, *supra*,

9 Cal.App.5th at p. 415 [citing *Ochoa* and noting that "[u]nder *Sanchez*, it appears that testimony about a nonparty's out-of-court admission that he or she is a gang member, offered to prove he or she *is* a gang member, is hearsay," but finding any error harmless].)

The Third District Court of Appeal has expressed disagreement with *Ochoa*, holding that testimony about participants other than the defendant being tried is "historical background information" about the "gang's conduct and activities" and that "a predicate offense is essentially a chapter in the gang's biography." (*People v. Bermudez* (2020) 45 Cal.App.5th 358, 363, 376-377 & fn. 13.) Our colleagues in Division Eight of this court also reached a contrary conclusion to that announced in *Ochoa*. (See *People v. Meraz, supra*, 30 Cal.App.5th at pp. 781 [holding that testimony about a gang's "pattern of criminal activities" constituted "general background testimony" because it was "unrelated to [the] defendants or the current shooting and mirrored the background testimony the expert gave in *Sanchez*"].)[8]

Here, the predicate offenses, none of which involved Johnson or Steele, were unrelated to the events on trial. Nonetheless, a portion of the detective's testimony referenced admissions by Toomes and Flowers, calling into question the proper characterization of the admissions as case-specific hearsay or

---

[8] In 2020, the California Supreme Court ordered briefing in *People v. Garcia* (July 10, 2018, F073515) 208 Cal.App.Unpub. LEXIS 4681 (nonpub. opn.), review granted October 17, 2018, S250670, to consider whether "gang expert testimony regarding uncharged predicate offenses to establish a 'pattern of criminal gang activity' under . . . section 186.22, subdivision (e) constitute[s] background information or case-specific evidence within the meaning of [*Sanchez*]," and whether "any error [was] prejudicial." (*People v. Garcia* (2020, S250670) 2020 Cal.LEXIS 4641.)

23

background information.  We need not resolve this issue, however, because other admissible evidence satisfied the requirement to prove two qualifying predicate acts.

>    d.    <u>Testimony Regarding the Predicate Offenses was Subject to a Valid Hearsay Exception and/or Independently Corroborated</u>

As explained above, an expert's recitation of case-specific facts does not run afoul of *Sanchez* if the facts are within the expert's personal knowledge, fall under an exception to the hearsay rule, or have been independently established by competent evidence. (*Sanchez*, *supra*, 63 Cal.4th at pp. 676-677, 686; *Thompkins*, *supra*, 50 Cal.App.5th at p. 406; see Discussion I, section A.2., *ante*.)  Much of the predicate offense evidence satisfies these exceptions.

First, to prove the commission of two statutorily enumerated offenses, the convictions of Toomes and Flowers were established through certified court records.  These were admissible under state hearsay rules to prove the offenses occurred.  (*Thompkins*, *supra*, 50 Cal.App.5th at p. 412; *People v. Duran* (2002) 97 Cal.App.4th 1448, 1460, citing Evid. Code, § 452.5 ["[Evid. Code, § 452.5, subd. (b)] creates a hearsay exception allowing admission of qualifying court records to prove not only the fact of conviction, but also that the offense reflected in the record occurred"].)  In addition, certified records such as these "are not testimonial in nature because they are 'prepared to provide a chronicle of some act or event relating to the public employee's duty' and are not 'produced to be used in a potential criminal trial or to determine whether criminal charges should issue.' "  (*Thompkins*, *supra*, at p. 412, quoting *People v. Taulton* (2005) 129 Cal.App.4th 1218, 1225.)

Johnson contends that *People v. Garcia* (2020) 46 Cal.App.5th 123, dictates a different result.  We disagree.  In *Garcia*, the court held that under *Kirby v. United States* (1899) 174 U.S. 47 [19 S.Ct.

24

574, 43 L.Ed. 890], a confrontation clause violation occurs if the prosecution seeks to prove more than the mere commission of a prior offense with conviction records. (*People v. Garcia, supra*, at p. 171.) The court concluded the use of conviction records to prove the date of the offense and thereby satisfy the statutorily-defined timeframe required by section 186.22, subdivision (e), "plainly violates *Kirby*'s proscription of the use of the records of prior convictions to prove any fact other than the fact of the prior conviction." (*People v. Garcia, supra*, at p. 172.)

The *Garcia* court found a confrontation clause violation with regard to one of the predicate offenses because the testifying officer had no involvement in the first offense and therefore must have relied upon testimonial hearsay in stating the date of the offense. (*People v. Garcia, supra*, 46 Cal.App.5th at p. 172.) With regard to the second predicate offense, however, the testifying officer personally participated in the arrest that led to the conviction. Based on the officer's personal knowledge of the relevant date, no confrontation clause violation occurred. (*Id.* at p. 173.)

In the present case, Detective Castaneda was personally involved in both predicate offenses, having served a search warrant in the Toomes case and having responded to the scene of the incident in the Flowers case. Therefore, the admission of his testimony about the date of the offense was consistent with *Garcia*.

The prosecution also was required to prove the predicate offenses were committed by gang members. Though neither of the predicate offenses included a gang enhancement finding, Detective Castaneda was personally involved in the investigation of both offenses, and testified that Toomes and Flowers were UGC gang members. Castaneda's knowledge was based in part on his personal observation of their gang-related tattoos, and based on additional contacts with each of the men. Testimony by an officer

about personal observations of an individual's tattoos, location, companions, or clothing, is not hearsay and thus does not run afoul of *Sanchez* or the confrontation clause. (*People v. Iraheta* (2017) 14 Cal.App.5th 1228, 1248.)

In sum, Detective Castaneda's testimony regarding the predicate offenses committed by Toomes and Flowers was independently corroborated by admissible evidence (the certified court records) and the detective's personal knowledge regarding the dates of the offenses and their gang membership. Therefore, the admission of this testimony was not error under *Sanchez*, and was not testimonial under *Crawford*. (See *Sanchez*, *supra*, 63 Cal.4th at p. 686.) To the extent the detective also testified that Toomes and Flowers admitted their gang membership to him, in view of the properly admitted evidence of their gang membership, any error in admitting their hearsay statements was harmless beyond a reasonable doubt. (See *People v. Meraz*, *supra*, 30 Cal.App.5th at p. 783 [finding any error in admitting expert testimony based on information supplied by other officers was harmless where the evidence was duplicative of other proof of gang membership]; *People v. Vega-Robles*, *supra*, 9 Cal.App.5th at pp. 414 & 416 [same].)[9]

5. *Evidence Regarding Steele's Gang Membership Was Properly Admitted*

Detective Castaneda testified that Steele told him he was a UGC gang member and his moniker was "Tiny Fly." Later, Detective Castaneda opined that Johnson was a UGC gang member based, in part, on his association with Steele.

---

[9] To the extent Johnson objects to additional testimony regarding the predicate offenses that might have qualified as case-specific, or testimonial, hearsay, its admission was harmless, as discussed below. (See Discussion I, section B.6., *post*.)

26

Johnson argues the trial court erred by admitting, over his objection, Detective Castaneda's testimony that Steele admitted he was a UGC gang member with the moniker Tiny Fly.

> a. Steele's Out-of-court Admission to Prove His Gang Membership Did Not Violate *Sanchez* or *Crawford*

Steele's own statements were admissible against him as a party admission and, as such, could not violate the confrontation clause as to him. (Evid. Code, § 1220 [out-of-court admissions by an opposing party are admitted for their truth]; *People v. Jennings* (2010) 50 Cal.4th 616, 662 [a defendant's own admissions do not implicate the confrontation clause " 'because the defendant only has the right to confront the "witnesses against him" ' "].) Moreover, Steele's statement that he was a UGC gang member and his moniker was Tiny Fly did not implicate Johnson. (See *Bruton v. United States* (1968) 391 U.S. 123 [88 S.Ct. 1620, 20 L.Ed.2d 476].)[10] The trial court admonished the jury that this testimony regarding Steele was not admissible against Johnson. The jury also was instructed that it "must separately consider the evidence as it applies to each defendant" and "decide each charge for each defendant separately."

---

[10] Under *Bruton* and its progeny, the admission at a joint trial of a nontestifying defendant's confession implicating a codefendant violates the confrontation clause if the confession is " 'facially incriminating' " of the nondeclarant defendant. (*People v. Fletcher* (1996) 13 Cal.4th 451, 455.) Johnson does not assert a claim of *Bruton* error.

### b. Additional Evidence Was Properly Admitted to Support the Expert's Opinion of Johnson's Gang Membership

In opining that Johnson was a gang member, Detective Castaneda acknowledged that his opinion was based, in part, on Johnson's association with Steele. Johnson argues that Steele's admission constituted case-specific hearsay to the extent the admission informed the detective's opinion of Johnson's gang membership.

If the sole basis for Detective Castaneda's opinion regarding Steele's gang membership had been Steele's admission, his reliance on that admission to conclude that Johnson was a gang member and the charged offense was gang related could constitute case-specific hearsay as to Johnson. (See *Sanchez*, *supra*, 63 Cal.4th at pp. 676-677, 686 [testimony is case-specific if it involves "participants alleged to have been involved in the case being tried"].) However, Detective Castaneda's opinion as to Steele's membership in UGC also was based on his personal observations and knowledge.

In addition to referencing Steele's self-admission during a patrol contact on July 28, 2015, Detective Castaneda testified that Steele showed him his UGC tattoos, including a "U" on his neck, and "UGC" on his back. The detective based his opinion that Steele was a current gang member on his "contact with Mr. Steele, the tattoos that [he] observed, as well as other tattoos that [he] photographed on prior occasions."[11] Detective Castaneda reviewed

---

[11] When the prosecutor followed up by asking Detective Castaneda whether Steele's admission in July 2015 played into the detective's "opinion *at all*" (italics added), Detective Castaneda asked the prosecutor to clarify whether he was referring to "[t]he entire contact itself or just the self-admittal to me?" After the

a series of photographs he recently had taken of Steele and testified that the photographs were relevant to his opinion that Steele was currently a UGC member, pointing out that Steele had clear UGC tattoos "on his face and neck, visible to the public eye."  As such, Detective Castaneda's opinion regarding Steele's membership was based in part on his past and present observations of Steele's gang-related tattoos.  These first hand observations do not implicate *Sanchez* or *Crawford* because such observations do not constitute hearsay.  (See *People v. Vega-Robles*, *supra*, 9 Cal.App.5th at p. 413 ["[a]s we read *Sanchez*, it is not error for a gang expert to testify about case-specific facts about which he has personal knowledge," nor does it "offend the confrontation clause," and noting the detective had such personal knowledge where he had, inter alia, personally met gang members, viewed their tattoos, and viewed letters signed under the gang name]; see also *People v. Mendez* (2019) 7 Cal.5th 680, 693 [finding no error under *Sanchez* where the defendant expressly "chose to let [the gang expert] testify to hearsay accounts of his prior police contacts," but also observing that the prosecutor potentially could have established the same facts "based on what the on-scene officers themselves observed"].)

Furthermore, Detective Castaneda's opinion regarding Johnson's gang membership also was based on his independent observations of Johnson.  The detective viewed recent photographs of Johnson showing several UGC related tattoos, including the

---

prosecutor responded, "Just the self-admittal," Detective Castaneda responded, "Yes."

In his opening brief, Johnson extracts the "just the self-admittal" excerpt to assert that Detective Castaneda's belief that Steele was a gang member was based only on " 'the self-admittal,' *not* the tattoos."  Johnson's assertion, however, is contrary to Detective Castaneda's testimony.

symbols that signified he was a member of a burglary/robbery crew. Detective Castaneda also personally reviewed Johnson's Facebook profile and posts, and found photographs in which Johnson was wearing attire associated with the UGC gang. Johnson's posts included statements such as "started school at HK University." The detective recognized the "HK" as an acronym for "Hoover Killers," referencing a rival of UGC. The photographs of Johnson in UGC related attire, as well as the "HK University" statement were posted only weeks before the instant home invasion robbery. Here again, the detective's personal observation of Johnson's tattoos does not constitute hearsay, and his reliance on Johnson's Facebook posts was permissible because they constituted party admissions. As such, we discern no *Sanchez* or *Crawford* error. (See *People v. Vega-Robles*, *supra*, 9 Cal.App.5th at p. 413.)

> 6. *The Admission of Additional Testimony That Might Qualify as Case-specific and/or Testimonial Hearsay Was Harmless Beyond a Reasonable Doubt*

Johnson challenges additional testimony elicited from Detective Castaneda during direct examination and cross-examination, which Johnson alleges is case-specific, testimonial hearsay.[12] Specifically, Johnson challenges the following testimony.

---

[12] In *Veamatahau*, our high court left open the question of whether hearsay elicited by a defendant on cross-examination that runs afoul of *Sanchez* should be deemed "invited . . . error." (See *Veamatahau*, *supra*, 9 Cal.5th at p. 27, fn. 2.) We need not resolve this question.

(i) *UGC Members Billy Shepherd, Marcus Broadmax, and Johnnie Johnson*

In testifying about his prior contact with Steele in July of 2015, Detective Castaneda noted Steele was in the company of three other UGC members. After Johnson's objection for lack of foundation, the detective testified that he knew the other three men from prior contacts. The three men were Billy Shepherd ("Hundred Dollar Bill"), Marcus Broadmax ("Lil Midnight"), and Johnnie Johnson ("Bingo"). Detective Castaneda testified all three had, at various times, admitted their gang membership to him. The court overruled Johnson's subsequent objection on grounds of hearsay and *Sanchez*.

(ii) *UGC Member Erik Ward*

In testifying about the predicate offense committed by UGC member Toomes, Detective Castaneda testified he had investigated another crime committed by Toomes with UGC member Ward. The court overruled Johnson's foundation and hearsay objections regarding Castaneda's knowledge that Ward was a UGC member.

(iii) *UGC Member Marques Coleman*

In testifying about Johnson's Facebook account, Detective Castaneda noted that in his profile picture, Johnson was with Marques Coleman, a UGC member. The detective's knowledge regarding Coleman's gang membership was based on several patrol contacts and Coleman's admission that he was a UGC member. The court overruled Johnson's objection on grounds of hearsay and *Sanchez*.

During cross examination, Johnson's counsel elicited from Detective Castaneda that Coleman admitted his UGC membership

sometime in 2014 or 2015 while the detective was investigating Coleman for another crime.

### (iv)   *UGC Member Darwin Nixon*

During direct examination, Detective Castaneda testified that there was an expectation that UGC members share and disburse funds obtained from crimes amongst the gang for their continuing operations, and that a gang member who refused to share such proceeds would suffer negative repercussions. Detective Castaneda stated his opinion was based on "[t]alking to hundreds of gang members about different scenarios in which they live day to day, which includes what were to happen if you commit a crime and keep the money to yourself."

During cross-examination, Johnson's counsel asked Detective Castaneda where he learned that there was an expectation that crime proceeds would be shared amongst the gang. Detective Castaneda responded that he learned this information from "[v]arious interviews that I conducted of individuals from different gangs, including the Underground Crips," and from reviewing reports of other robberies where proceeds were stored in stash houses for the gang. Johnson's counsel then asked Detective Castaneda if he knew of any specific instance in which a gang member suffered repercussions for failing to share proceeds from a crime. Detective Castaneda stated he did not, but had been told of such repercussions after talking with gang members. Johnson's counsel asked the detective "[w]hich gang members" told him about such repercussions. The detective responded that a UGC gang member named Darwin Nixon had explained such consequences while Nixon was in custody for an incident the detective was investigating at the time.

b. <u>In Light of the Wealth of Admissible Gang-related Evidence, Any Error in Admitting the Additional Testimony Challenged by Johnson Was Harmless Beyond a Reasonable Doubt</u>

Assuming the foregoing admissions by other individuals to Detective Castaneda was testimonial hearsay and was admitted in violation of the federal confrontation clause, we find any error harmless beyond a reasonable doubt in light of the wealth of gang-related evidence that was properly admitted. (See *People v. Bell* (2020) 47 Cal.App.5th 153, 196-197.)

First, as to the statements by Billy Shepherd, Marcus Broadmax, and Johnnie Johnson, Detective Castaneda was personally present for the encounter with Steele in July of 2015, spoke with him during the contact, and observed several UGC tattoos on his person. These observations provided a more direct link between Steele and UGC than the men found in his company. (*People v. Bell*, *supra*, 47 Cal.App.5th at p. 197 [finding harmless error where the properly admitted evidence of gang membership was "compelling," including the gang-related tattoos observed on two of the defendants].)

Second, as to Detective Castaneda's reference to Ward's commission of an offense with Toomes, as previously discussed, the detective was involved in the investigation of the predicate offense involving Toomes and personally observed a UGC related tattoo on Toomes. Thus, the reference to Ward was tangential to proving Toomes's gang membership.

In addition, the jury was instructed that if they found Johnson guilty of the charges on trial, they could consider his conduct in determining whether the "pattern of criminal gang activity" had been established. Thus, the jury's conviction of Johnson supplied the second predicate offense required by section

186.22, subdivision (e), and any error in admitting the detective's testimony regarding Toomes and Ward was harmless beyond a reasonable doubt. (See *People v. Garcia, supra*, 46 Cal.App.5th at p. 180 [finding any error involving predicate acts was harmless given the properly admitted evidence with regard to one predicate act and the fact the defendant's current conviction qualified as a predicate act].)

Third, Detective Castaneda's testimony regarding the Facebook photograph depicting Johnson in the company of UGC member Coleman was more tangential and indirect than the other gang-related observations regarding Johnson, such as his tattoos and Facebook posts, as outlined above. (See Discussion I, section B.5.b., *ante.*)

Fourth, and finally, we discern no reversible error regarding the detective's testimony about the expectation that UGC members will share crime-related proceeds. As previously discussed, this type of testimony was background information, it did not involve the disclosure of an out-of-court statement, and the detective could rely on hearsay in forming his opinion and tell the jury that he did so in general terms. (See *Sanchez, supra*, 63 Cal.4th at p. 699 [observing that the gang expert "provided general and admissible evidence that if a nonmember sold drugs in a gang's territory and failed to pay tax, that person risked gang retaliation"]; see also Discussion I, section B.3., *ante.*)

Moreover, the detective's identification of one UGC member (Darwin Nixon) as the source for his opinion about profit sharing was fodder for the defense to convince the jury they should accord less weight to this aspect of the detective's testimony. (See *Sanchez, supra*, 63 Cal.4th at p. 686 [noting the jury may accord less weight to the views of an expert who relies on a single source for his opinion].) To that end, both defendants presented experts

who contradicted Detective Castaneda's testimony regarding the sharing of profits by UGC gang members who commit crimes. (See *Veamatahau, supra*, 9 Cal.5th at pp. 32-34 [noting that the reliability or trustworthiness of an expert's testimony is a separate issue from its admissibility under the *Sanchez* rule and discussing various ways the court and the parties can test the reliability of expert testimony, including Evid. Code, § 402 hearings, cross-examination, and the presentation of competing experts].)

Given that Detective Castaneda's views on disbursement were based on conversations with hundreds of gang members and constituted permissible background information, we do not discern any prejudice from the fact that defense counsel elicited the testimony regarding Darwin Nixon. (See, generally, *Thompkins, supra*, 50 Cal.App.5th at pp. 408-409 [observing that even though a gang officer referenced at least once the existence of police reports as the source of his testimony, he "would have learned much" from his personal involvement in relevant investigations, and thus it would be inaccurate to say he solely relied on police reports].)

In sum, we are confident the jury's verdict on the gang enhancements would have been the same in this case absent any improperly admitted gang-related facts under *Sanchez* or *Crawford*. We conclude that any error in admitting the foregoing additional testimony was harmless beyond a reasonable doubt.

7. *There is No Merit to Johnson's Challenge to the Prosecution's Hypotheticals*

To the extent Johnson challenges the prosecutor's presentation of "gigantic, compound hypotheticals," he acknowledges his challenge is entirely premised on his *Sanchez*/*Crawford* arguments directed at the admissibility of the underlying, gang-related facts and his assertion that the hypothetical was "the sum product of this compound error." As

such, our disposition of these underlying arguments also disposes of Johnson's challenge to the hypotheticals. (See *Sanchez*, *supra*, 63 Cal.4th at p. 676 [noting that the "distinction between generally accepted background information and the supplying of case-specific facts is honored by the use of hypothetical questions"]; *People v. Anthony*, *supra*, 32 Cal.App.5th at p. 1136 [*Sanchez* permits experts to testify to their opinions in response to hypothetical questions]; see also *Thompkins*, *supra*, 50 Cal.App.5th at p. 418 [finding an expert's opinion was properly admitted where "[m]ost statements he made as the basis for his opinion either were not hearsay, were supported by testimony from others that was not hearsay, or were supported by admissible criminal records"].)

## II
## Sufficiency of the Evidence To Support the Gang Enhancement Allegation

Steele contends the jury's true finding on the gang enhancement allegation must be reversed because there was insufficient evidence the crimes were gang-related. Steele notes that "[t]he crimes at issue had an obvious financial motive and occurred outside of any gang territory." As explained below, we conclude that substantial evidence supports a finding that Steele committed the charged crimes "in association with" the UGC gang.

### A.    Relevant Legal Principles
#### 1.    *Standard of Review*

"The standard of appellate review for determining the sufficiency of the evidence supporting an enhancement is the same as that applied to a conviction." (*People v. Weddington* (2016) 246 Cal.App.4th 468, 483.) "We view the evidence in the light most favorable to the prosecution, and presume in support of the judgment the existence of every fact the trier could reasonably

36

deduce from the evidence." (*People v. Griffin* (2004) 33 Cal.4th 1015, 1028.)

2.     *Elements of the Gang Enhancement Allegation*

To prove a gang enhancement, the prosecution must establish that the underlying crime was "committed for the benefit of, at the direction of, or in association with any criminal street gang" (the gang-related prong), "with the specific intent to promote, further, or assist in any criminal conduct by gang members" (the specific intent prong). (§ 186.22, subd. (b)(1); see *People v. Albillar* (2010) 51 Cal.4th 47, 59.)[13] Because the first prong is worded in the disjunctive, the gang enhancement may be imposed based on either gang association, direction, or benefit. (*People v. Weddington*, *supra*, 246 Cal.App.4th at p. 484.) The prosecution may rely on expert testimony regarding criminal street gangs to establish the crime was committed for the benefit of, or in association with, a qualifying gang. (*People v. Vang* (2011) 52 Cal.4th 1038, 1048 [" '[e]xpert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the . . . gang enhancement"]; see also *People v. Albillar*, *supra*, at p. 63 ["[e]xpert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[ ] criminal street gang' within the meaning of § 186.22[, subd.] (b)(1)"].)

---

[13] In addition, the prosecution must prove the relevant group meets the definition of a "criminal street gang" as defined in section 186.22, subdivision (f). (See Discussion I, section B.4.a., *ante*.) On appeal, Steele focuses on the gang-related and specific intent prongs of the gang enhancement; he does not challenge the sufficiency of the evidence to support the "criminal street gang" element.

The expert's testimony, however, " 'must be rooted in facts shown by the evidence.' " (*People v. Vang*, *supra*, 52 Cal.4th at p. 1045.) "[P]urely conclusory and factually unsupported opinions" are insufficient to support a gang enhancement. (*People v. Ramirez* (2016) 244 Cal.App.4th 800, 819-820; see *People v. Vang*, *supra*, at p. 1046.)

## B. There Was Sufficient Evidence To Support the Jury's Finding on the Gang Enhancement Allegation

The record supports a finding that Steele and Johnson committed the underlying offenses as gang members acting in association, thus satisfying the first, "gang related" prong of the statute. Steele, who admitted membership in the UGC gang, and was observed with various UGC related tattoos shortly before the charged crimes, committed the crimes with Johnson, another UGC member, as established by his tattoos, and Facebook statements and photographs posted shortly before the instant offense. (See *People v. Albillar*, *supra*, 51 Cal.4th at p. 62 ["[the] defendants came together *as gang members* to attack [the victim] and, thus, . . . they committed these crimes in association with the gang"]; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 ["the jury could reasonably infer the requisite association from the very fact that [the] defendant committed the charged crimes in association with fellow gang members"].)

In addition, Detective Castaneda testified that robberies and burglaries are among the UGC gang's primary activities. (Cf. *People v. Ochoa* (2009) 179 Cal.App.4th 650, 661-662 & fn. 7 [where the gang's primary activities included car theft, finding insufficient evidence that the charged crime of carjacking was one of its primary activities].) He established that UGC members are expected to, and do, share the proceeds of their crimes. Johnson's UGC tattoos included tattoos signifying he was a member of a UGC

38

burglary/robbery crew.  (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 930 [a gang finding may be based upon circumstantial evidence, and "[i]t is well settled that expert testimony about gang culture and habits is the type of evidence a jury may rely on to reach a verdict on a gang-related offense or a finding on a gang allegation"].)

The fact that a gang member recognized for his participation in the gang's burglary/robbery crew joined together with a second gang member to commit a home invasion robbery, coupled with the evidence that burglary and robbery were among the gang's primary activities and its members were expected to share their ill-gotten gains with the gang, satisfies the specific intent prong of section 186.22, subdivision (b)(1).  (See *People v. Albillar*, *supra*, 51 Cal.4th at p. 68 [finding substantial evidence the defendants acted with the specific intent to promote, further, or assist the gang where they intended to rape the victim, they assisted one another in committing the crime, and they were each members of a criminal street gang].) Indeed, as our Supreme Court has held, "if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members."  (*Id.* at p. 68.)

To the extent Steele and Johnson presented their own gang experts with contrary opinions, "[t]he credibility and weight of the expert testimony was for the jury to determine, and it is not up to us to reevaluate it."  (*People v. Flores* (2006) 144 Cal.App.4th 625, 633; see also *People v. Albillar*, *supra*, 51 Cal.4th at pp. 60, 63-64 [finding sufficient evidence to support the finding that a rape by gang members was gang-related, despite the expert's testimony

"that the 'general view' on rape by Latino street gangs 'is that it is frowned upon' "].)

Steele's reliance on *People v. Albarran* (2007) 149 Cal.App.4th 214, to argue otherwise is misplaced. In *Albarran*, the defendant and a second individual shot at a house during a private birthday party. A divided panel concluded that a new trial motion should have been granted because inflammatory gang evidence had been introduced that "had no bearing on the underlying charges," and there was little or no evidence of the gang's connection to the crime. (*Id.* at pp. 227-228.) At trial, a sheriff's deputy conceded he did not know of a motive for the shooting. (*Id.* at p. 227.) The second shooter was never caught or identified, leading the court to observe that the fact that more than one shooter was involved, without any additional information, did not demonstrate "one way or another that the crime was gang motivated." (*Ibid.*, fn. 9.)

Unlike *Albarran*, here the evidence of gang membership, behavior, and primary activities was substantial and was tailored to the charges. Both Steele and Johnson were identified as gang members and convicted for their role in the home invasion robbery. The totality of the evidence was sufficient for the jury to find that they committed the underlying offenses "in association" with the UGC gang and with the specific intent to promote, further, or assist in criminal conduct by the gang. That the circumstances also might " 'reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " (*People v. Thomas* (1992) 2 Cal.4th 489, 514; cf. *People v. Morales*, *supra*, 112 Cal.App.4th at p. 1198 [observing that "the typical close case is one in which one gang member, acting alone, commits a crime"].)

40

## III

## Imposition of Sentences for Both the Firearm and Gang Enhancements Against Steele

As part of the second amended information, in addition to the gang enhancement, the prosecutor alleged firearm enhancements under subdivision (e)(1) of section 12022.53 against both Steele and Johnson. Subdivision (e)(1) makes unarmed principals subject to any of the personal use enhancements listed in subdivisions (b), (c), and (d), if the prosecution establishes that (1) the person violated subdivision (b) of section 186.22 (i.e., the criminal street gang enhancement), and (2) *any* principal in the offense personally used a weapon as described in subdivisions (b) through (d). (§ 12022.53, subd. (e)(1); *People v. Gonzalez* (2010) 180 Cal.App.4th 1420, 1424-1426.) Here, the jury found true the allegations as pleaded against each appellant, i.e., that a principal personally used a firearm in the commission of the offense.

Under section 12022.53, subdivision (e)(2), "[a]n enhancement for participation in a criminal street gang . . . shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, unless the person *personally* used or *personally* discharged a firearm in the commission of the offense." (Italics added.) There was no finding by the jury that either Steele or Johnson personally used a firearm in committing the charged crimes. Nevertheless, the trial court imposed both a section 12022.53 firearm enhancement and a section 186.22 gang enhancement against Steele based on the court's own finding that "[Steele] was clearly the lead actor in this," and "was the one with the gun."

Steele argues there was insufficient evidence to support a finding that he "personally" used a firearm. In light of the absence of any jury finding on the question of personal use, we asked the

41

parties to file supplemental briefs to address whether the trial court was authorized to (1) make a finding that Steele personally used a firearm during the underlying offense; and (2) impose both a life term for the gang enhancement pursuant to section 186.22, subdivision (b)(4), and a consecutive 10-year sentence for the firearm enhancement pursuant to section 12022.53, subdivision (e).

In their supplemental letter briefs, both parties recognize the trial court lacked the authority to make the "personal use" finding. We agree. (See § 12022.53, subd. (j) ["For the penalties in this section to apply, the existence of any fact required under subdivision (b), (c), or (d) shall be alleged in the accusatory pleading and either admitted by the defendant in open court or found to be true by the trier of fact"].) Respondent therefore concedes the trial court erred in imposing both enhancements against Steele. (See *People v. Gonzalez*, *supra*, 180 Cal.App.4th at p. 1427.) We agree that under section 12022.53, subdivision (j), the enhancement with the greater penalty term must be imposed, while the other must be stricken. (*People v. Brookfield* (2009) 47 Cal.4th 583, 596.) Accordingly, the 10-year enhancement imposed under section 12022.53, subdivision (e)(1), must be stricken from Steele's sentence. (*People v. Brookfield*, *supra*, at p. 597 ["The trial court erred in sentencing [the] defendant to *both* the life term under [§] 186.22, [subd.] (b)(4) and the 10-year sentence enhancement under [subds.] (b) and (e)(1) of [§] 12022.53 [and] [t]he Court of Appeal was correct in ordering the 10-year sentence enhancement stricken"].)[14]

_____

[14] We note that in pronouncing its sentence, the trial court sentenced Steele under section 186.22 to a base term of 15 years to life, doubled to 30 years for a strike prior. However, Steele's current abstract of judgment does not reflect the jury's true finding on the gang enhancement. Upon issuing an amended abstract of

## IV
## Propriety of Staying the Sentence on Johnson's Gang Enhancement, While Imposing Sentence on the Firearm Enhancement

In its sentencing memorandum, the prosecutor stated that because Johnson was not the gunman (and thus did not personally use a firearm), the court could not impose both the firearm and gang enhancement against him; instead, it must choose one. The prosecution recommended that the trial court impose a sentence of 15 years to life for the home invasion offense, thereby utilizing the gang enhancement penalty term.

Conceding the robbery, and acknowledging the use of a firearm by a principal, Johnson's counsel argued a determinate term was appropriate and suggested the low term of three years for the robbery itself. Defense counsel argued against the imposition of the gang enhancement penalty, asserting that a life term would be draconian and unfair.

In response to the parties' arguments, the trial court commented on Johnson's youth as a mitigating factor, noting that he had turned 18 years of age just months before the incident. The court highlighted the fact that Johnson did not personally use a firearm and was acting at the direction of the older robber. In aggravation, the trial court pointed to a prior juvenile adjudication suffered by Johnson, the vulnerability of the victims, and Johnson's willingness to repeatedly follow the directions of the gunman throughout the home invasion robbery. As a result, the trial court selected the upper term of nine years for the robbery in count 1 and

judgment with the modifications ordered in our opinion, the trial court should ensure that Steele's abstract reflects imposition of the gang enhancement.

43

added a 10-year term for the section 12022.53 firearm enhancement, for an aggregate term of 19 years. The court stated it was "choosing to stay [section] 186.22[, subdivision (b)], the gang allegation, given its imposition of the gun allegation," and noted that "[i]t may not impose both [enhancements]."

On appeal, Johnson contends the trial court lacked the authority to stay the gang enhancement, and requests the matter be remanded with directions for the trial court to instead strike the gang enhancement.

As previously explained (see Discussion III, *ante*), a vicarious liability enhancement under section 12022.53, subdivision (e), may not be imposed in addition to the gang enhancement. Instead, the enhancement with the longest term must be imposed and the other enhancement must be stricken. (*People v. Brookfield*, *supra*, 47 Cal.4th at pp. 596-597.) In this case the enhancement with the longest term is the gang enhancement, which would mean the trial court was obligated to impose the gang enhancement penalty against Johnson, while striking the firearm enhancement.

Trial courts, however, are authorized to strike the additional penalties provided for under section 186.22 and section 12022.53 in the interests of justice. (§§ 186.22, subd. (g) ["Notwithstanding any other law, the court may strike the additional punishment for the enhancements provided in this section . . . in an unusual case where the interests of justice would best be served"]; 12022.53, subd. (h) ["The court may, in the interest of justice pursuant to [s]ection 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section"].)

The trial court began Johnson's sentencing hearing by acknowledging that it had read both sentencing memoranda and was "fully aware" it had "wide discretion," including the discretion "whether or not to impose the gang allegation; whether or not to

44

impose the gun allegation." Neither the sentencing memoranda, nor the probation officer's report, however, delineated the court's discretion to strike one or both enhancements in the interests of justice. While the trial court acknowledged it could not impose both enhancements against Johnson, the reference to its discretion was ambiguous and does not clearly reflect that it was aware it had the latitude to strike both enhancements. Its comments preceding pronouncement of sentence suggest it found a life term excessive in light of Johnson's young age and role in the offense. Given this record, we conclude that a remand for resentencing is appropriate. (See *People v. Salvador* (2017) 11 Cal.App.5th 584, 594 [where a sentencing error occurred, "providing the trial court with a fresh opportunity for sentencing is the most efficient and respectful solution"].) Upon remand, if the trial court determines that the interests of justice would be served by striking either or both enhancements, it should so state on the record. If it does not find such grounds exist, the court must impose the enhancement with the longest penalty term, which in this case would be the gang enhancement penalty provision, and strike the firearm enhancement.

## V
## Stayed Sentences Under Section 654

As noted in our procedural history, the jury found both appellants guilty as charged in count 2 of the information and found true the associated firearm and gang enhancement allegations. At sentencing, the trial court ordered the sentence "stayed" on count 2 pursuant to section 654, with regard to each appellant. To effectuate section 654, however, the trial court must first impose the full term and then stay execution of that term. The failure to do so—or the imposition of an incorrect term—amounts to an unauthorized sentence. (*People v. Relkin* (2016) 6 Cal.App.5th

45

1188, 1198; *People v. Alford* (2010) 180 Cal.App.4th 1463, 1469-1472.)[15]  A claim that a sentence is unauthorized "is subject to judicial correction whenever the error comes to the attention of the reviewing court." (*People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6; *In re Harris* (1993) 5 Cal.4th 813, 842.)

Accordingly, upon remand, the trial court shall impose sentence on count 2 with regards to each appellant prior to staying the term under section 654.

## VI

## Implied Striking of the One-year Prior Prison Term Enhancement as to Steele

The trial court found true allegations that Steele suffered a prior "strike" conviction, a prior serious felony conviction, and that he had served a prior prison term.  During the sentencing proceedings, the trial court imposed sentence with regard to both the strike prior and the prior serious felony conviction, but made no mention of the prior prison term it found true pursuant to section 667.5, subdivision (b).

Effective January 1, 2020, Senate Bill No. 136 amended section 667.5, subdivision (b), to apply only where the prior prison term was served "for a sexually violent offense as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code." (§ 667.5, subd. (b); see Sen. Bill No. 136 (2019-2020 Reg. Sess.) § 1.)  Because the judgment in the current case is not yet final, Senate Bill No. 136 applies to Steele.  (*People v. Winn* (2020) 44 Cal.App.5th 859, 872-873 [Senate Bill No. 136 applies to nonfinal

---

[15] "[O]therwise if the nonstayed sentence is vacated, either on appeal or in a collateral attack on the judgment, no valid sentence will remain." (*People v. Alford, supra,* 180 Cal.App.4th at p. 1469.)

46

judgments on appeal].)  Accordingly, Steele's one-year prior prison term enhancement must be stricken.

## VII
### Presentence Custody Credits

Steele and Johnson claim they are each entitled to two additional days of presentence custody credits.  Respondent agrees, as do we.  Appellants were arrested on September 30, 2015, and sentenced on November 20, 2019.  Including the arrest and sentencing dates, appellants were in actual custody for 1,513 days, rather than 1,511 days as calculated by the trial court.  Accordingly, appellants are each entitled to a total of 1,513 days of actual custody credit.  (§ 2900.5; *People v. Morgain* (2009) 177 Cal.App.4th 454, 469 ["A defendant is entitled to credit for the date of his arrest and the date of sentencing"].)

## DISPOSITION

As to appellant Steele, the judgment of conviction is affirmed.  The sentence is vacated and the matter is remanded to the trial court with directions to: (1) strike the 10-year firearm enhancement imposed in count 1 pursuant to section 12022.53, subdivision (e)(1); (2) impose sentence for count 2, prior to staying the term under section 654; (3) strike the prior prison term enhancement under section 667.5, subdivision (b); and (4) award Steele two additional days of presentence custody credits, for a total of 1,513 days of actual custody credit.  The trial court is directed to prepare an amended abstract of judgment reflecting the changes to Steele's sentence and forward a copy to the Department of Corrections and Rehabilitation.

As to appellant Johnson, the judgment of conviction is affirmed.  The sentence is vacated and the matter is remanded to

the trial court for resentencing on count 1. As to count 1, the trial court shall exercise its discretion to consider whether to strike the additional punishment for either the gang enhancement, or the firearm enhancement, or both, in the interests of justice pursuant to section 186.22, subdivision (g), and/or section 12022.53, subdivision (h). In the event the trial court determines that the interests of justice would be served by striking either or both enhancements, it shall so state on the record. If the trial court does not find such grounds exist, the court must impose the enhancement with the longest penalty term, which in this case would be the gang enhancement penalty provision under section 186.22, and strike the firearm enhancement under section 12022.53. The trial court also shall impose sentence for count 2, prior to staying the term under section 654, and award Johnson two additional days of presentence custody credits, for a total of 1,513 days of actual custody credit. The trial court is directed to prepare an amended abstract of judgment reflecting the changes to Johnson's sentence and forward a copy to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED

FEDERMAN, J.*

We concur:

ROTHSCHILD, P. J.          CHANEY, J.

---

*Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.